IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

No. 15-1243

**FILED**

**April 20, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

MICHAEL P. COOKE,
Respondent

Lawyer Disciplinary Proceeding
Nos. 14-05-474, 15-05-135, and 15-05-250

LAW LICENSE SUSPENDED AND OTHER SANCTIONS

Submitted: March 8, 2017
Filed: April 20, 2017

Jessica H. Donahue Rhodes, Esq.
Lawyer Disciplinary Counsel
Office of Disciplinary Counsel
Charleston, West Virginia
Attorney for Petitioner

Michael P. Cooke, Esq.
Bluefield, West Virginia
*Pro Se* Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

2.      "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syl. Pt. 1, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995).

3.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

4. "W. Va. Code, 29-21-14 [1981], which governs state payment of counsel fees for indigent criminal defendants, envisages a system where each client is proportionately billed according to the time spent *actually* representing that client; consequently, billing for more hours than are actually worked is duplicative billing that is clearly contrary to the system envisaged by the legislature." Syl. Pt. 1, *Frasher v. Ferguson*, 177 W.Va. 546, 355 S.E.2d 39 (1987).

5. "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. Pt. 4, *Office of Lawyer Disc. Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

6. "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

7.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession."  Syl. Pt. 3, *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).

WORKMAN, Justice:

This lawyer disciplinary proceeding is before the Court upon the objection of respondent Michael P. Cooke (hereinafter "Cooke") to the recommended discipline of the Hearing Panel Subcommittee (hereinafter "HPS") of the Lawyer Disciplinary Board, arising from three disciplinary complaints for which he was found to have committed twelve violations of the West Virginia Rules of Professional Conduct. The HPS recommended that Cooke be subjected to a three-month suspension, a requirement of petition for reinstatement, one-year supervised practice, nine hours of CLE, and payment of costs. Cooke objects only to the requirement that he petition for reinstatement at the close of his three-month suspension. The Office of Disciplinary Counsel (hereinafter "ODC"), however, requests a more severe sanction of eighteen months' suspension from practice.

This Court has before it all matters of record, including the exhibits and a transcript of the evidentiary hearing conducted by the Board, as well as the briefs and argument of counsel and the pro se respondent. We agree with the twelve enumerated violations found by the HPS; however, based on this Court's independent review of the record, we find that Cooke additionally violated Rule 8.4(c) of the West Virginia Rules of Professional Conduct by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation relative to the complaint filed by Public Defender Services (hereinafter "PDS"). We commensurately find that the recommended sanctions of both the HPS and ODC are inadequate to fully effectuate the goals of the disciplinary process.

1

Accordingly, we therefore modify the HPS' recommendation and order that Cooke be suspended from the practice of law for two years and adopt the remainder of the HPS' recommended sanctions.

## I. FACTS AND PROCEDURAL HISTORY

Cooke, who was admitted to the West Virginia State Bar in 2005, practices in Bluefield, West Virginia. His practice consists almost entirely of court-appointed work in the areas of criminal defense, juvenile truancy, and abuse and neglect in both Mercer and Raleigh Counties. Cooke also worked for some unspecified period of time as a Mental Hygiene Commissioner until 2014. The underlying complaints involve conduct spanning the two-year period of 2014 and 2015.[1]

*Complaint of the Office of Disciplinary Counsel*

The first complaint, filed in September 2014, emanates from this Court's referral of Cooke to ODC for his failure to timely file a guardian ad litem brief in an abuse and neglect matter. By Scheduling Order entered July 8, 2014, Cooke was to file a guardian ad litem brief or summary response with this Court by August 7, 2014, but failed to do so. Upon contact by the Clerk's office, Cooke offered no explanation as to why he did not file a brief, but indicated he would file one by August 18, 2014; he once

_____

[1] Inasmuch as the West Virginia Rules of Professional Conduct were amended effective January 1, 2015, both the former and amended Rules are implicated herein. For Rules that were not changed as a result of the amendments or for conduct occurring after the amendments, only the current version of the Rule is cited. Where the prior Rule is applicable, it is noted herein.

again failed to do so.  A Notice of Intent to Sanction directed Cooke to file a brief or summary response by August 29, 2014, yet he again failed to do so.  Upon issuance of a Rule to Show Cause on September 3, 2014, Cooke filed a one-page summary response the next day.

In his response to the ODC's complaint, Cooke stated that "during the time the appeal was pending," he was experiencing a "medical issue" causing him to sleep between ten and sixteen hours a day and underwent two minor surgeries,[2] after which he was able to file his brief.  Cooke also indicated that he had "overextended" himself by taking on too many cases.  On October 8, 2014, ODC wrote to Cooke inquiring as to whether he had advised this Court about his medical issues and requesting a response within twenty days, yet he once again failed to respond.  On November 6, 2014, ODC wrote again, reiterating its request and directing Cooke to reply by November 17.  On November 18, ODC received a letter from Cooke replying that he had not advised the Court of his medical issues because in his experience, "an attorney's personal medical issues are not of concern to a Court."  He promised changes to his office procedures, but complained that he had lost two office assistants.

In a sworn statement before the ODC, Cooke admitted that he failed to timely file his brief, but noted that "the chances of the judge's decision getting reversed

---

[2] The "medical issue" was identified by Cooke as "low testosterone," which he maintains can cause fatigue.  The two minor medical procedures occurred on August 5 and August 28; Cooke indicates he had little down-time from these procedures, however.

were—are almost non—non-existent" and that the children's "voice was heard, but it was heard very delayed." Testimony before the HPS by staff members of this Court's Clerk's office indicated that Cooke's delay caused administrative burden and delay to the processing of the case.

Based on this complaint, the HPS found four violations of the West Virginia Rules of Professional Conduct, as follows: Rule 1.3 (diligence),[3] 8.4(d) (conduct prejudicial to the administration of justice),[4] 3.4(c) (fairness to opposing party and counsel)[5], and 8.1(b)[6] (failure to respond to disciplinary matter).

*Complaint of Dana Eddy, PDS*

On November 26, 2014, Dana Eddy, Executive Director of the West Virginia PDS, wrote to Cooke about certain "billing anomalies" observed in his review of Cooke's fee vouchers. In particular, Cooke was found to have exceeded fifteen billable hours a day on thirty-one dates from mid-January, 2014 to mid-September, 2014. In

---

[3] Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[4] Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

[5] Rule 3.4(c) prohibits a lawyer from "knowingly disobey[ing] an obligation under the rules of a tribunal[.]"

[6] Rule 8.1(b) prohibits a lawyer, in connection with a disciplinary matter, from "knowingly fail[ing] to respond to a lawful demand for information from . . . [a] disciplinary authority[.]"

addition, on four dates he submitted vouchers for twenty-three or greater billable hours and on two dates he submitted vouchers for greater than twenty-four hours.[7] In addition to the total amount of time billed for each, Mr. Eddy found that the actual time billed appeared suspicious. Mr. Eddy indicated that Cooke appeared to be billing the same travel time to multiple matters, billing multiple entries of the same activity and amount of time on multiple matters,[8] and outright duplicate billing of activity on the same file.

Mr. Eddy further expressed concern about the cumulative amount of time Cooke was billing to PDS annually, specifically the years 2011-2014. From 2011 through 2014 Cooke billed $122,300.50, $108,474.50, $128,654.00, and $157,291.50, respectively. His annual hours billed during this time period ranged from a low of 2,279.3 hours in 2012 to a high of 3,259.46 in 2014.[9]

Cooke was thereafter placed on a "watch" list at PDS and required to include additional detail in his billing; Mr. Eddy also requested an explanation of the "anomalies" outlined in his letter. Having received no response from Cooke, Mr. Eddy wrote again on February 13, 2015 requesting a response by February 23. Cooke alleges

---

[7] Mr. Eddy also noted that Cooke billed twenty-seven hours on the day after Christmas in 2013.

[8] Mr. Eddy referenced charges for review of orders in as many as thirty-seven (37) cases on the same day, billing the same amount of time for each.

[9] Specifically, Cooke billed 2,568.5 hours, 2,279.3 hours, 2,671.2 hours, and 3,259.46 hours for the years 2011-2014, respectively. These billable hours equate to an average *daily* billable rate of 7 hours, 6.2 hours, 7.3 hours, and 8.9 hours, for 365 days.

5

that he faxed a letter on February 23, requesting PDS to provide him with a detailed accounting of his time on the days in question such that he could provide explanation. Mr. Eddy testified below that his office did not receive this response, although Cooke produced a copy of the letter. As a result of his belief that Cooke had once again failed to respond, Mr. Eddy filed a complaint with ODC.

On March 20, 2015, a complaint was opened by ODC and forwarded to Cooke with a response due on April 20; however, Cooke failed to respond. On April 27, 2015, ODC once again requested a response to the complaint and Cooke replied the day before his response was due. In his response, Cooke primarily complained that he was unable to provide a better answer to Mr. Eddy's request for an explanation of his billing because Mr. Eddy had not provided him with an accounting of his time and that his own time-keeping system would not permit him to retrieve that information.[10] In response to the aggregate hours billed, Cooke asserted that he is "forced to work in my office outside of normal business hours in order to get things accomplished . . . . [t]his means that I am working at my office, or at home, very early in the mornings, late at night, and on weekends and holidays." With respect to 2014's hours, Cooke indicated that the hours billed reflected not only his billable time, but that of two contract attorneys. The record reflects that Cooke engaged a part-time contract attorney from September 2013 to April

---

[10] Cooke apparently kept a "contact sheet" in each client file where he would record his time, rather than in a daily journal form.

or May 2014[11] and a full-time contract attorney from December 2013 to March 21, 2014. Cooke indicated that he simply billed their hours as his own since they were working as contract attorneys, but was unaware that he was supposed to designate the time as being performed by someone else in his voucher submissions.[12]

Subsequent to filing the complaint with ODC, Cooke and Mr. Eddy met and, at Mr. Eddy's request, Cooke provided PDS explanatory letters for his billing on three specific dates; these specific dates are days where the time billed was purportedly that of Cooke and his two contract attorneys. Upon receipt of the explanations, PDS and Cooke entered into a "Conciliation Agreement" wherein Cooke would refund certain documented double-billed items (totaling $727.80) and would agree to a 25% ($15,554.64) reduction of vouchers which were pending payment.[13]

---

[11] Elsewhere within the appendix record, however, Cooke states that this attorney worked until September, 2014. We find no evidence in the record otherwise indicating which statement is accurate. However, an accounting of time billed to PDS in August, 2014, contains the billable time of an attorney with whom Cooke was sharing office space who "covered" a hearing for him, rather than the part-time attorney previously identified.

[12] Mr. Eddy explained that billing others' time was permissible, but that the voucher should indicate as much in the explanation field.

[13] Mr. Eddy was careful to explain to the HPS that these particular pending vouchers were not themselves being scrutinized, but that the 25% was withheld from these vouchers as a settlement of sorts for "historical overbilling." Mr. Eddy further indicated that Cooke was in the "lower midrange" of reductions, i.e. he was not the worst offender. He explained that the 25% reduction was a "negotiated percentage, essentially, based upon what we believe were the additional overbillings which he did not admit or (continued . . .)

7

The HPS took extensive testimony from Mr. Eddy. Mr. Eddy explained that PDS is paying $25 million a year to court-appointed counsel that are, in his opinion, undercompensated at $45/hour for "out of court" time and $65/hour for "in court" time.[14] He indicated that when requesting an hourly increase at the Legislature he was typically confronted with the fact that many attorneys were making greater than $100,000.00 a year in court-appointed work and that the legislators took a dim view of an hourly rate increase when, in their opinion, the court-appointed attorneys had given themselves a "raise" by overbilling. Therefore, to curtail this abuse, Mr. Eddy began the voucher review process and began entering conciliation agreements with counsel to achieve some reimbursement and create a hindrance to continued overbilling. He further expressed concern that although he suspected overbilling, he believed that he often had little actual proof of it.

---

which, frankly nobody could actually confirm based upon the state of everybody's records involved[.]" Mr. Eddy testified that Cooke's response to his request for an explanation of the excessive hours was to demand more documentation from PDS so that Cooke could "unravel[] what his records should've already shown." Mr. Eddy stated that he found this frustrating since, by statute, Cooke was required to maintain detailed and accurate records.

[14] More specifically Mr. Eddy testified that the total cost of indigent defense is $51 million. He explained that expense for panel attorneys is typically line-itemed in the budget for $10.3 million, but that it typically requires approximately $25 million, necessitating PDS to request the Legislature to make supplemental funding from other accounts. Mr. Eddy testified that fully funding panel counsel "may involve transfers of moneys from 20 to 30 different accounts to get it for us."

8

Mr. Eddy testified that upon review of the vouchers being submitted by court-appointed counsel, he noted that many were billing in excess of fifteen hours a day on a regular basis. He testified that based on his thirty years of experience such billing was not sustainable over a long period of time; therefore, he endeavored to "flag" those individuals for closer review. He explained that, by statute, court-appointed counsel are required to maintain "accurate and detailed" records of time and are to bill only "actual time" expended on a matter. He testified that initially he believed Cooke's time could only be explained by either billing staff time as attorney time and/or "value billing," *i.e.* billing the "value" of a task, rather than the actual time it took.

After meeting with Cooke and further review of his explanations, Mr. Eddy concluded that

> in most instances, he provided the services that he indicated he did. *I do believe that he duplicated his billing at times with respect to travel and with respect to waiting in court*, but that is more based upon his complete absence of any timekeeping system within his office. . . . [I]t really was a complete lack of organization, I think, that resulted in that overbilling.

(emphasis added). Mr. Eddy reiterated that although Cooke overbilled, he believed it was "due to disorganization and inadvertence." Nonetheless, Mr. Eddy testified that "I do believe he probably engaged in some value billing, but I had no real proof that that was the case."[15] He further stated that

---

[15] For example, Mr. Eddy testified:
(continued . . .)

9

this was not a situation where he was putting down services that were not performed, which is the obvious criminal activity in our view and the obvious fraudulent view. *It was still my belief, however, that he was probably charging too much time for some of those services on a regular basis.*

(emphasis added).

Despite being charged with violation of Rule 8.4(c)[16] (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), the HPS found only two violations of the Rules of Professional Conduct: Rule 8.4(d)[17] (conduct that is prejudicial to the administration of justice) and Rule 8.1(b) (failure to respond to the ODC complaint). Based upon Mr. Eddy's testimony, the HPS did not find sufficient evidence to support a finding that Cooke's actions were "dishonest, fraudulent, deceitful or misleading." Rather, it found that his actions were merely negligent and that "[t]here was not clear proof that [Cooke] overbilled the PDS[.]"

---

> I had no proof that I felt I could present that would establish a clear ethical violation. It remains my opinion, however, that many of [the] entries, for example a .2 on 37 occasions on one day for review of an order leads me to believe that [Cooke] did not actually spend 12 minutes on each one of those orders, but I have no proof of that.

[16] Rule 8.4(c) states that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" Given that the vouchers are submitted to the circuit court for approval before submission to PDS, the Investigative Panel could have (and likely should have) charged Cooke with making a false statement to a tribunal as prohibited by Rule 3.3(a)(1).

[17] *See* n. 4, *supra.*

10

*Complaint of Peggy Robinette*

On or about October 10, 2014, Ms. Robinette hired Cooke to represent her in voiding a deed wherein she conveyed her property to her son while she was in a nursing home. She paid Cooke $1,500.00, which he promptly put into one of his firm operating accounts. Although Cooke characterized this account as a "trust account," it bore no such designation. In January, 2015, Cooke wrote a letter to Ms. Robinette's son demanding that he contact Cooke to discuss the deed; it appears, however, that Cooke sent the letter to the wrong addressee.[18] On January 26, 2015, Cooke corresponded with Ms. Robinette, advising that he would file suit in February if he did not hear from her son. Ms. Robinette claimed that Cooke would not return her calls thereafter and filed a complaint on June 8, 2015.

Cooke's response to Ms. Robinette's complaint was due on July 5, 2015; however, he failed to respond. ODC wrote to Cooke to elicit a response to the complaint by a new deadline of July 27, 2015; he once again failed to respond. After being subpoenaed for a sworn statement with ODC on September 23, Cooke finally responded to the complaint on August 21, 2015. In his response, Cooke claimed that he did speak with Ms. Robinette by telephone many times (approximately every two weeks), but that she and/or a friend on her behalf called incessantly. Cooke further claims that he determined that the transfer of the property may have been done for Medicare purposes

---

[18] Whether this is based on faulty information from Ms. Robinette or was Cooke's error is unclear and largely inconsequential.

relative to her nursing home stay and that voiding the transfer would require a greater time investment than what he had envisioned and he could not handle the matter; however, he did not convey that to Ms. Robinette. On September 11, 2015, he refunded Ms. Robinette her full $1,500.00 despite claiming to have performed ten hours work on the matter.

During Cooke's sworn statement regarding this complaint, he indicated that he did not have an IOLTA account although he knew "from day one" that he needed to have one. He suggested that he had attempted to get information regarding IOLTA accounts from the State Bar on several occasions, but had received nothing. Documents subpoenaed from Cooke's bank revealed further that none of his accounts were designated as "trust accounts." Finally, during the sworn statement, ODC suggested that Cooke needed to send a termination of representation letter to Ms. Robinette, which he subsequently did. Ms. Robinette passed away before the disciplinary hearing below.

The HPS found six violations arising out of Cooke's representation of Ms. Robinette.[19] Because he failed to properly terminate representation of Ms. Robinette, the

---

[19] Despite not timely responding to the ODC complaint or follow-up letter, Cooke was not charged with violating Rule 8.1(b) for failure to respond to a request from disciplinary counsel as pertains to this complaint.

HPS found that Cooke violated Rule 1.4(a)(1)[20] (promptly informing client of matters requiring informed consent), 1.4(a)(3)[21] (keeping client reasonably informed), and 1.4(b)[22] (explaining a matter to permit informed decision-making). Because Cooke failed to hold her funds in a "client trust account" or IOLTA account, the HPS found that he violated Rule 1.15(a) and (f)[23] (safekeeping property). Because he failed to promptly refund Ms. Robinette's retainer, the HPS found that Cooke also violated Rule 1.15(d)[24] (safekeeping property).

With respect to the appropriate discipline, the HPS found that two aggravating factors were present: multiple offenses and substantial experience in the practice of law. However, the HPS found that Cooke's absence of a prior disciplinary record, absence of dishonest or selfish motive, good faith effort to make restitution, and

---

[20] Rule 1.4(a)(1) requires a lawyer to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules[.]"

[21] Rule 1.4(a)(3) requires a lawyer to "keep the client reasonably informed about the status of the matter."

[22] Rule 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[23] Rule 1.15(a) requires client funds to be "kept in a separate account designated as a 'client's trust account[.]'" Subsection (f) (formerly Rule 1.15(d)) provides that funds which are "nominal in amount or are expected to be held for a brief period," must be kept in "a pooled, interest or dividend-bearing account" in compliance with State Bar Administrative Rule 10.

[24] Rule 1.15(d) requires a lawyer to "promptly deliver to the client . . . any funds . . . that the client . . . is entitled to receive[.]"

imposition of other penalties vis-à-vis the Conciliation Agreement were mitigating factors.

The HPS determined that for Cooke's "intentional, and inexcusable transgressions of his duties to his infant clients and the legal system," he should suffer a suspension of some duration. However, insofar as his failure to communicate with Ms. Robinette and safekeep her property, the HPS noted that Cooke's conduct did not appear to be part of a pattern and practice of his business. Moreover, citing the absence of "clear proof that Respondent overbilled the PDS," the HPS found the ODC's recommended suspension of eighteen months to be too harsh. Accordingly, the HPS recommended a ninety-day suspension, required petition for reinstatement, one-year supervised practice, nine hours of CLE, and payment of costs. Cooke thereafter objected to the HPS' recommended discipline, giving rise to the instant proceeding.

## II. STANDARD OF REVIEW

With respect to the HPS' findings,

> [a] *de novo* standard applies to a review of the adjudicatory record made before the [HPS] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

14

Syl. Pt. 3, *Comm. On Legal Ethics of W. Va. v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). As pertains to the deference due the HPS' factual findings, the *McCorkle* Court elaborated:

> While this standard of review is deferential, it should not be seen in any way as requiring this Court to "rubber stamp" the Committee's factual findings. In another context . . . the Supreme Court of the United States distinguished judicial review and judicial abdication of the review function. Speaking for the Court, Justice Marshall observed that a deferential standard of judicial review does not "shield ... [an agency's action] from thorough, probing, in-depth review." The Supreme Court emphasized, however, that "the ultimate standard of review is a narrow one." Justice Marshall's admonition [] is applicable here. In every case involving lawyer discipline, we will *review* the Committee's findings of fact and not rubber stamp them. Only by giving due deference to such factual findings *and* by carefully reviewing the record can we properly perform our reviewing task.

*Id.* at 290 n.9, 452 S.E.2d at 381 n.9 (citations omitted) (emphasis in original). We are mindful, however, that the Rules "require[] the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syl. Pt. 1, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 789, 461 S.E.2d 850, 851 (1995). With these standards in mind, we proceed to our review of the HPS' findings and recommended discipline.

## III. DISCUSSION

Cooke's briefing in this matter makes clear that he does not challenge the HPS' conclusions regarding his various violations of the Rules of Professional Conduct. Nor, apparently, does Cooke take issue with the HPS' recommended discipline of three

15

months suspension. Rather, his lone challenge to the Report of the HPS is the requirement that he be required to petition for reinstatement at the end of his three-month suspension. With or without a lawyer's acceptance of the HPS' findings and recommendations, as noted above, it is incumbent upon this Court to carefully review the findings of the HPS and "exercise[e] its own independent judgment" with respect to recommended discipline. Syl. Pt. 3, *McCorkle*. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

That being said, however, it is clear that there is little utility in belaboring the HPS' findings with respect to the violations arising out of the ODC and Robinette complaints. As to the ODC complaint, Cooke admitted that he very clearly disregarded multiple Court orders for the filing of his guardian ad litem brief. Cooke's dereliction to his infant clients, by his own admission, "was clearly inappropriate [and] resulted in a delay of any adoption proceeding for the children involved in the appellate matter." As to the Robinette complaint, Cooke mishandled virtually every aspect of this representation, resulting in manifest violations of the standards of professional conduct for diligence, communication, and safekeeping of property as more particularly enumerated by the HPS. All that remains with respect to these matters is to ascertain whether the recommended discipline is appropriate. However, before proceeding to the

16

disciplinary aspect of this matter, our review of the adjudicatory record reveals that closer examination of the HPS' findings with respect to the PDS complaint is warranted.

**A.**     ***Violations Arising Out of the Complaint of PDS***

As indicated above, the HPS found that the evidence presented with respect to the PDS complaint did not establish a violation of Rule 8.4(c) prohibiting conduct involving "dishonesty, fraud, deceit or misrepresentation."  Citing Mr. Eddy's testimony that Cooke was "simply [] a completely disorganized individual" lacking any "nefarious purpose," who merely failed to comply with statutory timekeeping requirements, the HPS found only that Cooke's conduct was prejudicial to the administration of justice, as prohibited by Rule 8.4(d).

With all due respect to the HPS, however, it appears to have disregarded the more particular testimony given by Mr. Eddy which clearly demonstrates that, despite his unwillingness to overtly accuse Cooke of fraud, he did believe that the documentation revealed that Cooke had engaged in pervasive overbilling.  As indicated above, Mr. Eddy stated that he believed Cooke was charging too much time on a regular basis, whether through duplicate billing or value billing.  Mr. Eddy reiterated several times his belief that Cooke was charging excessive time, yet was reluctant to characterize his conduct as fraudulent because it was not as egregious as others:

> I still hold firm that we were billed for duplicate—we were billed several times for the same trip, that we were billed several times from the same period of waiting in court.  In other words, if he had three hearings, let's say he waited in

17

court for one hearing while he was actually doing another hearing. That's not properly [sic] billing. That's billing the same period of time. So I firmly believe that that had happened, but in looking through the vouchers and everything else, *it appeared to be less frequent than I had seen with other counsel.*[25]

The only perceived fraud or deception that still exists in my mind is the fact that he may have been value billing, that is, billing a .2 for an activity that should've only been a .1 or a .4 when it should've been a .2. However, he wasn't billing me 3.0 for these things and he was—and he was saying 12 minutes as opposed to 240 minutes. . . . *I just did not see in his case the overt deception that existed with many other attorneys. . . .* He was unable to exonerate himself completely in this situation because he had failed to comply with that time requirement, but that, overall, I believe that he was zealously representing his clients and he was providing the actual services that were described even though the time allotted to them may have been—may not have been the actual time.

(footnote added) (emphasis added). Moreover, despite the HPS' conclusion that Cooke was not guilty of conduct which was dishonest, fraudulent, deceitful or misleading, it clearly agreed with Mr. Eddy's impression that Cooke's overall billable hours were simply not credible: "[T]he hours he was billing well exceed those of any 'super' attorney. Billing over two thousand, and two hundred (2,200) hours, every year, for the past 4 to 5 years is not just an extraordinary practice but could be seen as quite

---

[25] Mr. Eddy gave the example of one attorney who "rubber-stamped" the same time for each day and one attorney who billed 900 hours of travel in a three-month period. He felt that "none of what Mr. Cooke was doing, in my opinion, raised to that level" in that he "wasn't engaging in what I would consider to be criminal behavior." Mr. Eddy estimated that out of 800 attorneys doing court-appointed work "700 of them are probably billing honestly, in fact scrupulously."

18

impossible." It is this incongruity that compels this Court to utilize its plenary review to ascertain the extent of Cooke's violation of Rule 8.4.

West Virginia Code § 29-21-13a(a) (2008) requires panel counsel for the PDS to "maintain detailed and *accurate* records of the time expended and expenses incurred on behalf of eligible clients[.]" (emphasis added). Subsection (d) of that statute provides that panel counsel "shall be compensated . . . for *actual* and necessary time expended for services performed and expenses incurred[.]" (emphasis added). Further, Syllabus Point 1 of *Frasher v. Ferguson*, 177 W.Va. 546, 355 S.E.2d 39 (1987) states:

> *W. Va. Code*, 29-21-14 [1981], which governs state payment of counsel fees for indigent criminal defendants, envisages a system where each client is proportionately billed according to the time spent *actually* representing that client; consequently, billing for more hours than are actually worked is duplicative billing that is clearly contrary to the system envisaged by the legislature.

(emphasis in original).

Upon careful review of the somewhat limited adjudicatory record,[26] it appears that during the time period of January 21, 2014, through September 18, 2014,

---

[26] The record does not reflect the time billed on any other days which may have further demonstrated a pattern of extraordinary billed hours, yet simply fell short of the fifteen-hour benchmark utilized by Mr. Eddy to identify potential offenders. The record further contains no information from Cooke's contract attorneys to vouch for the hours attributed to their work, nor does there appear to have been a review of Cooke's files to compare the time billed to the items in the file. Moreover, as noted during oral argument, Cooke also performed work as a guardian ad litem and mental hygiene commissioner. The record contains no information about the amount of time being billed to these (continued . . .)

Cooke billed more than fifteen hours a day on thirty-seven different days.[27] On five of those days, he billed in excess of twenty hours and on two of those days, he billed greater than twenty-four hours. Cooke maintains that during that period of time he was billing the time of the contract attorneys working for him, as well as his own.[28] However, per Cooke's own testimony, this would have occurred for only some portion of the time period at issue inasmuch as his "full-time" contract attorney quit in late-March, leaving only the part-time contract attorney, who likewise quit at some point later that year.

Moreover, during this time period, Cooke contends that he was suffering from diagnosed "low testosterone" which caused him to sleep between ten and sixteen hours a day; medical records introduced into evidence do in fact support such a diagnosis in June, 2014. Cooke maintains that this fatigue continued throughout the time frame in which the guardian ad litem matter was "pending" and continued until November, 2014.[29]

---

separately funded matters to create a more complete picture of the amount being billed to the State of West Virginia by Cooke.

[27] Mr. Eddy references thirty-one different dates on which Cooke billed greater than fifteen hours; however, the supporting documentation reveals thirty-seven dates from January 21, 2014 through September 18, 2014.

[28] However, when he first proffered this explanation for his hours in his response to the PDS, Cooke stated "[n]ow, given the method of tracking billable hours I used in the past, there is no way I can ascertain whether that is correct[.]"

[29] The abuse and neglect appeal was filed in February, 2014; however, the deadline to perfect the appeal was extended, resulting in Cooke's brief being due in August, 2014. Cooke first complained to his doctor of fatigue in June, 2014; by (continued . . .)

Therefore, giving Cooke the benefit of every doubt, this purported fatigue and reduced working capacity would have existed from approximately February until November, 2014—the exact time period under scrutiny for overbilling. Per Cooke's own testimony, therefore, during this time there would have been between only eight and fourteen hours of the day in which he could even be awake to perform work.

Accordingly, for three different dates during this period— March 6, April 17, and August 18—Cooke provided a letter of explanation attempting to account for all the time billed to PDS and ferreting out the time that was billed by others. However, *despite purportedly being awake only eight to fourteen hours a day*, Cooke still ostensibly billed 15.7, 19.4, and 13.3 hours, respectively, after deducting the time which he attributed to other attorneys. Moreover, Cooke's itemization of the work he performed on those dates does not fully account for these billed hours. For example, on March 6, Cooke accounts for only 9.7 of his own billable hours out of the residual 15.7 hours after deduction of the contract attorneys' time.[30] On April 17, he accounts for only 15.5 hours of his own billable time out of the 19.4 residual hours after deduction of

---

September, 2014, his testosterone was reported as normal in his labwork, although, as indicated, Cooke purports that the effects lingered into November, 2014.

[30] Cooke billed 33.2 hours to PDS; in his letter of explanation, he attributes 17.5 hours to his contract attorneys, leaving 15.7 hours billed by Cooke himself. He accounted for only 9.7 of those hours.

others' time.[31]  On August 18, Cooke accounts for only 13.3 of his own billable time of the 15.8 residual hours after deduction of others' time.[32]

While the failure to account for the time billed to PDS is certainly indicative of overbilling, the actual accounting of his time provided by Cooke is replete with admittedly excessive charges.  Cooke maintains, however, that this excess billing reflects "clerical errors" rather than deliberate overbilling.  We find that the volume and nature of these errors on dates randomly selected by PDS for further explanation—which are almost exclusively to Cooke's monetary benefit—belie any suggestion that they are inadvertent.  While Cooke's explanations are somewhat inscrutable, that portion which is clear is patently demonstrative of excessive billing on its face.  Cooke billed travel multiple times and duplicated travel and other activity across multiple vouchers.[33]  He billed time for activity which did not occur on the dates indicated and failed to

---

[31] Cooke billed 25.7 hours to PDS; he attributed 6.3 hours to his contract attorneys, leaving 19.4 hours billed by Cooke himself.  He accounted for only 15.5 of those hours.

[32] Cooke billed 18.1 hours to PDS; he attributed 2.3 hours to an attorney covering for him, leaving 15.8 hours billed by Cooke himself.  He accounted for only 13.3 of those hours.

[33] On April 17, Cooke admittedly double-billed 1.0 in travel to/from a hearing to two separate matters, both of which were scheduled at 1:30 before the same judge.  He further admitted to duplicative billing of 2.7 additional hours.  On March 6, round trips for travel were billed on seven different vouchers on this date for a total of 9.7 hours.  On April 17, round trips to the courthouse were billed on seven different vouchers totaling 8.0 hours.

demonstrate that the time was not duplicatively billed on the days in which it actually

occurred.[34] Cooke frequently "value billed," billed time at far greater than he admittedly

documented, and billed time for the same activity over multiple vouchers.[35] Moreover,

he frequently billed greater amounts of time than were available during certain windows

of activity.[36] *See Disciplinary Counsel v. Holland*, 835 N.E.2d 361, 363 (Ohio 2005)

---

[34] On March 6, Cooke admits that 2.8 hours of another attorney's billed activity did not occur on this day. On April 17, he admits to .2 billable hours which did not occur that day.

[35] Cooke rarely billed activity at less than .2 hours (12 minutes); the only .1 (6 minutes) entries are attempted phone calls and, occasionally, a hearing. Review of any and all documentation or correspondence, including email, is billed at a minimum .2 hours. Virtually every hearing entails billing .3 hours for "waiting in court," which affords a higher hourly rate.

On March 6, among the time billed by one contract attorney, Cooke admits that activity documented as .4 was billed as 4.0 hours. On April 17, Cooke further admits that travel billed at 1.0 hour was actually documented at .3 hours. On March 6, entries for "preparing notice of appeal," "preparing brief," and "preparing habeas" were billed on three different vouchers for a total of 10.7 hours. On April 11, Cooke billed 37 separate entries for "reviewed order" on multiple vouchers.

[36] On April 17, based on Cooke's accounting of his time utilizing his schedule and the court's docket, in the *two*-hour window from 1:00 p.m. until a 3:00 meeting at the jail, he billed a cumulative 4.3 hours of "actual time"; the activity billed all consisted of travel, waiting in court, and attending hearings. Similarly, on August 18, Cooke's in-court schedule shows hearings at 9:00, 9:30, and 10:30 with the docket resuming at 1:00. The matters which were scheduled in the *three*-hour window from 9:00 a.m. until noon, were billed at a cumulative 6.1 hours. Additionally, matters beginning at 1:15 p.m. on that date were billed at additional 7.2 hours and consisted solely of waiting in court, reviewing "court summaries" while waiting, and attending hearings.

According to Cooke, none of these amounts reflect multi-tasking, *i.e.* reviewing a document while also waiting in court. Cooke's explanatory letter was careful to note that document review was performed in his office and if it had occurred prior to a hearing, he would have commensurately reduced the time billed to "waiting in court."

(using similar comparison of court docket and schedule with hours billed by court-appointed attorney to establish overbilling, observing that attorney billed fees "sometimes for more in-court hours than the juvenile court was open in a day," including "an impossible" number of billable hours ranging from nine to twenty-four hours on thirty-four different days).

Mr. Eddy observed that Cooke's inflated hours were frequently *de minimus* in nature; however, we conclude that this is of absolutely no moment. Given Cooke's stated caseload of approximately 200 cases, it would take very little inflation of any given time entry when spread among numerous matters and multiple vouchers to aggregate appreciably excessive fees. *See Holland,* 835 N.E.2d at 363, 365 (finding lawyer's "outrageous fee charges" not "readily apparent" in court-appointed matters "because fees are claimed in each client's case on separate forms filed at different times" and "present[] too small a picture to reveal respondent's excessive charges"). To whatever extent Cooke's overbilling is not singularly impressive with respect to a particular entry, his annual billings and billable hours are a stark reflection of his insidious activity. Despite Cooke's insistence that his impressive hours reflect the billable hours of, at times, three attorneys, annual billings which precede the time period when he had three billing attorneys are simply implausible. In the three years preceding the PDS' audit, Cooke

24

billed 2,568.5, 2,279.3, and 2,671.2 billable hours respectively.[37] These hours necessitate billing an average of 7, 6.2, and 7.3 billable hours *every day for 365 days a year.* As Mr. Eddy indicated, although such billable time and even greater may occur during discrete periods of time, this pace is not reasonably sustainable over a prolonged period of time. *See Dayton Bar Ass'n v. Swift,* 33 N.E.3d 1, 3 (Ohio 2014) (finding annual billable hours of 2,555.5 hours, 2,967 hours and noting average daily billable hours of 7 and 8.12 hours for 365 days "extraordinarily high"). Further, this time does not account for additional hours billed in his role as mental hygiene commissioner or serving as guardian ad litem in abuse and neglect or family court matters, which are payable from funding sources separate from PDS.

Based upon our review of the foregoing, this Court concludes that Cooke was in fact engaging in extensive overbilling to the State of West Virginia, misconduct which plainly qualifies as "dishonest, fraudulent, deceitful or misleading" in violation of Rule 8.4(c) of the West Virginia Rules of Professional Conduct.[38] The HPS appeared to

---

[37] As Mr. Eddy stated in his complaint to ODC: "For five fiscal years the average yearly total hours would be 2612.6 hours. Simply stated, this is impossible, especially when it is maintained continually over a five years' period of time."

[38] This conclusion, however, does not supplant the HPS' finding of a violation of Rule 8.4(d) for misconduct prejudicial to the administration of justice. As Mr. Eddy explained, overbilling by lawyers such as Cooke consumes already strained resources at PDS for the investigation and resolution of such matters. Accordingly, this Court declines to disturb the HPS' finding of a violation of Rule 8.4(d), finding rather that Cooke's conduct is *also* violative of Rule 8.4(c).

feel unnecessarily confined by Mr. Eddy's begrudging testimony that he believed Cooke to be simply "disorganized," despite the supporting documentation, Mr. Eddy's considerable experience, and the instincts of the HPS indicating otherwise.[39] The documentation contained in the adjudicatory record undermines any suggestion that the overbilling was isolated and accidental. The randomly selected days which Cooke was called upon to account for are filled with admittedly improper and/or unsubstantiated billing. The pervasiveness of this billing activity, the pattern of Cooke's billing practices, the annual figures on their face, as well as Cooke's admitted duplicative and/or improper billing are sufficient to establish, by clear and convincing evidence, misconduct violative of Rule 8.4(c).[40]

---

[39] Mr. Eddy's testimony made abundantly clear that because Cooke was not the "worst offender" Mr. Eddy chose to give him some benefit of the doubt. Mr. Eddy's testimony seemed to suggest that because services were *in fact* rendered by Cooke, inflating the time spent on such services was not necessarily the type of misconduct prohibited by Rule 8.4(c). This Court emphatically disagrees.

[40] We observe that Cooke's misrepresentation of his billable hours would also appear to give rise to a violation of Rule 3.3(a)(1) which prohibits a lawyer from "mak[ing] a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]" Because the vouchers reflecting a court-appointed lawyer's time must be tendered to and approved by the appointing circuit judge, any knowing falsity contained therein would be violative of the Rule. Disciplinary authorities are cautioned to bring all appropriate charges arising from lawyer misconduct.

### B. *The <u>Jordan</u> Factors*

Turning now to the appropriate discipline to be imposed in this matter, we are guided by this Court's holding in Syllabus Point 4 of *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998):

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

As is clear from the foregoing discussion of Cooke's misconduct with PDS, Cooke's extraordinary overbilling was not only intentional and pervasive within the time period at issue, but long-standing. Given the state of the public fisc, the actual injury to the taxpayers of the State of West Virginia is all too real. As the Supreme Court of Ohio stated, overbilling the state for representing indigent clients "exploit[s] an already overburdened system designed to aid the poorest members of our society and lessen[s] public confidence in the legal profession and compromise[s] its integrity." *Holland,* 835 N.E.2d at 366. Cooke's misconduct in that regard, therefore, profoundly affects the public, the legal system, and the profession.

Moreover, while the bulk of the foregoing discussion has been dedicated to Cooke's overbilling to PDS, by no means does this Court intend to minimize the seriousness of Cooke's other violations. In particular, Cooke's failure to timely file a guardian ad litem brief with this Court in an abuse and neglect matter is not only violative of the Rules of Professional Conduct, but in complete disregard of the countless warnings issued by this Court regarding the appellate obligations of guardians ad litem. *See In re A. N.,* Nos. 15–0182 and 15–0208, 2015 WL 5738019 (W. Va. Sept. 30, 2015) (disqualifying guardian ad litem from further appointments for failure to timely file brief on behalf of infant in abuse and neglect matter); *In re B.L.*, Nos. 14-0660 and 14–0714, 2015 WL 3631681, at *2 (W. Va. June 10, 2015) ("[W]e wish to re-emphasize how vitally important it is for guardians ad litem to comply with Rule 11(h) of the Rules of Appellate Procedure and this Court's orders in a timely fashion so that abuse and neglect appeals can be promptly and efficiently resolved. Guardians ad litem must submit a response brief or summary response that specifically responds to each of the assignments of error raised on appeal."); *In re Katie S*., 198 W.Va. 79, 91, n.16, 479 S.E.2d 589, 601, n.16 (1996) ("Part of [the guardians ad litem's] representation is to file an appellate brief to insure that their clients' interests are presented."); Rule of Procedure for Child Abuse and Neglect 18a, Appendix A, Section E(3) ("If an appeal is filed by another party in an abuse and neglect case, the GAL is required to file a respondent's brief or summary response that adheres to the requisite provisions of Rule 11 of the Rules of Appellate Procedure.").

As should be apparent to any guardian ad litem, needless delay is not only a gross disservice to his or her infant client, but also actively perpetuates the continuing harm occasioned by the lack of permanency. "Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). When that delay is directly attributable to the dereliction of the court-appointed guardian ad litem, the guardian has abdicated his or her responsibilities to the child so fully that it is difficult to surmise of a more egregious failure within our abuse and neglect system.

With regard to Cooke's dilatory misconduct in the Robinette matter, as well as his persistent refusal to respond to ODC, PDS, and particularly this Court, we are equally troubled. On the heels of being subject of a rule to show cause issued by this Court and an ODC complaint for his failure to timely file a guardian ad litem brief, Cooke failed to respond to the ODC's request for additional information regarding the pending complaint. Cooke then failed to respond to PDS' letter demanding an explanation of his billing irregularities and, more importantly, failed to timely respond to the PDS disciplinary complaint. Notwithstanding the pendency of these complaints, Cooke again failed to timely file a response to the Robinette complaint and a subsequent letter demanding a response.[41] Incredibly, despite receiving the HPS' recommendation of

---

[41] *See* n.19 and 40, *supra*. Disciplinary authorities are again cautioned to bring all appropriate charges arising from lawyer misconduct including but not limited to charges for failure to respond to ODC pursuant to Rule 8.1(b).

29

suspension of his law license and despite assurances to the HPS that he had rectified this dilatory conduct, Cooke likewise filed his response brief in the instant matter untimely.

Significantly, although Cooke has not been formally disciplined previously, he was "strongly warned" in the Investigative Panel's dismissal of another complaint in October 2013 that future violations of Rule 1.3 (diligence) and 1.4 (communication) would subject him to more severe discipline. In that matter, he likewise twice failed to respond to ODC and was also warned that future failures to respond to disciplinary counsel would be handled more harshly. Like the Robinette complaint, Cooke had been accused in the October 2013 complaint of taking on a matter which he did not have time to handle, failing to communicate with the client about that inability, and only refunding the client's retainer after an ODC complaint was filed. Cooke was warned that he should be "aware of his schedule and current client list to enable him to determine whether he has the ability to take on new clients." Just as in this case, Cooke told ODC that "he needed to make changes to how he runs his office which includes returning telephone calls in a reasonable time." There remains little question that Cooke's assurances to the HPS and this Court ring entirely hollow.

## C.    *Appropriate Sanctions*

As set forth hereinabove, the HPS recommended a ninety-day suspension, requirement of a petition for reinstatement, one-year supervised practice, along with additional CLE and payment of costs. ODC recommends a suspension of eighteen

30

months.  Focusing primarily on Cooke's failure to timely file his guardian ad litem brief, the HPS found support for its recommended ninety-day suspension in similar cases involving failure to make timely filings.  *See Lawyer Disciplinary Bd. v. Sturm*, 237 W.Va. 115, 785 S.E.821 (2016) (ninety-day suspension for failure to file habeas petition and appeal); *Lawyer Disciplinary Bd. v. Conner*, 234 W.Va. 648, 769 S.E.2d 25 (2015) (ninety-day suspension for failure to perfect appeal and other violations); *Lawyer Disciplinary Bd. v. Sullivan*, 230 W.Va. 460, 740 S.E.2d 55 (2013) (thirty-day suspension for failure to correct criminal sentencing and other violations); *Lawyer Disciplinary Bd. v. Santa Barbara*, 229 W.Va. 344, 729 S.E.2d 179 (2012) (one-year suspension for failure to file within statute and perfect jurisdictional notice requirements, and other violations).

As pertains to the Robinette complaint, the HPS cited *Lawyer Disciplinary Board v. Morgan*, 228 W.Va. 114, 717 S.E.2d 898 (2011), wherein a lawyer failed to establish an IOLTA account, did not respond to ODC, and took retainers for work he did not perform, resulting in a one-year suspension.  The HPS distinguished Cooke's conduct from that in *Morgan*, however, as "not appear[ing] to be part of a pattern and practice of [his] business."[42]  Moreover, with respect to the PDS complaint, the HPS distinguished *Lawyer Disciplinary Board v. Cavendish*, 226 W.Va. 327, 700 S.E.2d 779 (2010),

---

[42] Certainly the 2013 complaint wherein Cooke behaved in precisely the same manner would suggest otherwise.

wherein a lawyer billed PDS for non-existent claims and was suspended for three years. The HPS reiterated the perceived absence of proof of Cooke's dishonesty and the refund of money occasioned by the conciliation agreement.

Having concluded that Cooke *did* commit a violation of Rule 8.4(c), we take a different view of *Cavendish* and find it an appropriate starting point for evaluation of Cooke's conduct. In *Cavendish*, a lawyer recently hired by PDS submitted assignment schedules to Daniels Capital Corporation for advance payment of PDS-owed fees.[43] Cavendish stipulated that he received advance payments for "work he had not performed by misrepresenting the amount due him," work performed for privately retained clients in violation of statute, and work performed under a prior employer, which would have been entitled to the fees. *Id.* at 336, 700 S.E.2d at 788. The Court found that a three-year suspension was appropriate because Cavendish violated duties to clients, the public, the legal system, and the profession through his intentional misconduct. Noting the financial

---

[43] Cooke likewise assigned his PDS vouchers to Daniels Capital Corporation. As explained in *Cavendish*,

> [b]y entering into a contract with Daniels Capital Corporation, a lawyer representing an indigent defendant can assign what is owed to him or her by Public Defender Services to Daniels Capital which immediately pays the lawyer up to 75% of the money due to the lawyer. When Daniels Capital Corporation receives the assigned payment from Public Defender Services, Daniels Capital Corporation then pays the lawyer the balance of the payment, less its fee.

226 W.Va. at 330-31 n.2, 700 S.E.2d at 782-83 n.2.

injury caused by Cavendish's conduct that also "lessen[ed] people's faith and confidence in the legal profession," the Court found a three-year suspension appropriate. *Id*. at 338, 700 S.E.2d at 790.

However, the Court likewise noted that Cavendish attributed his conduct to a cognitive disorder and expressed concern that he was unable to maintain a law practice due to his "memory problems." *Id.* Citing this Court's duty to protect the public, it found "additional support" for a three-year suspension in Cavendish's admitted inability to practice law. *Id.* Like Cavendish, Cooke "misrepresented the amount due him" by inflating and/or improperly billing his time to PDS. However, this case does not present the same concerns about Cooke's cognitive ability to maintain a law practice.

Cooke's conduct is not without highly similar precedent outside of our jurisdiction. In *Disciplinary Counsel v. Milhoan*, 29 N.E.3d 898 (Ohio 2014) a court-appointed lawyer failed to keep proper track of his time, resulting in improper fee applications including instances where he "billed two separate clients for the same drive to the Ashland County clerk of courts[.]" *Id*. at 900. The court found that a two-year suspension was warranted. In *Swift*, the court found Swift's average daily billable hours and annual aggregate billable hours, along with failure to "maintain independent time records for himself or for the other attorneys whom he allegedly supervised" warranted discipline. 33 N.E.3d at 3. The *Swift* court noted that "the sheer volume of Swift's false statements to the affected courts, the complete absence of any documentation to assist

[the] court in determining the full extent of his overbilling . . . sufficiently egregious" to warrant two-year suspension. *Id.* at 4. The court noted further that such discipline was warranted as the state was essentially at the mercy of court-appointed attorneys to honestly submit their billings: "The courts and the public defender's offices must rely upon the trustworthiness and integrity of the attorneys who seek payment to provide accurate information regarding their time and billing." *Id.* at 3. *See also Attorney Grievance Comm'n of Md. v. Tun*, 51 A.3d 565 (Md. Ct. App. 2012) (indefinitely suspending lawyer for negligent, rather than intentional overbilling on court-appointed cases); *Attorney Grievance Comm'n of Md. v. Hess*, 722 A.2d 905 (Md. Ct. App. 1999) (suspending lawyer for three years for inflating client bills).

Therefore, as demonstrated in *Cavendish* and the foregoing cases, with respect to fraudulent billing, suspensions of *years*, rather than months, appear to be the norm. This Court considers the protection of the public and the State coffers of paramount importance, particularly as pertains to lawyer disciplinary matters. "[A]ttorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice[.]" *Comm. on Legal Ethics of the W. Va. State Bar v. Keenan*, 192 W.Va. 90, 94, 450 S.E.2d 787, 791 (1994). Moreover, the discipline meted out by this Court should serve the equally important purpose of deterrence:

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also

34

> whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. Pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987). In view of the foregoing, we find that Cooke's misconduct warrants a two-year suspension from the practice of law. Cooke's defrauding of the State through overbilling, gross mishandling of a client matter and funds, his dereliction of duty to his infant clients as a guardian ad litem—all of which is compounded by his unrelenting pattern of unresponsiveness and empty reassurances of remediation—plainly justify this degree of discipline.

## IV.  CONCLUSION

For the foregoing reasons, we impose the following sanctions:  1) Cooke is hereby suspended from the practice of law for two (2) years and is directed to abide by the duties imposed pursuant to Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; 2) If Cooke is successfully reinstated in the future, upon reinstatement, he is to be supervised by another attorney approved by ODC for a period of one (1) year; 3) Prior to being reinstated to the practice of law pursuant to Rule 3.32 of the Rules of Lawyer Disciplinary Procedure, Cooke must complete an additional nine (9) hours of CLE with six (6) hours in office procedures and/or office management and an additional three (3) hours in ethics; and 4) Prior to being reinstated to the practice of law, Cooke must

35

reimburse the costs of these proceedings to the Lawyer Disciplinary Board pursuant to

Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law license suspended and other sanctions imposed.