IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 18-0869

_____

FILED
**March 20, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

DANIEL R. GRINDO,
A MEMBER OF THE WEST VIRGINIA STATE BAR,
Respondent

_____

Lawyer Disciplinary Proceeding
No. 17-03-308

TWO-YEAR SUSPENSION AND OTHER SANCTIONS
_____

Submitted: March 4, 2020
Filed: March 20, 2020

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Office of Disciplinary Counsel
Charleston, West Virginia
Attorney for Petitioner

Eric B. Snyder, Esq.
Steven R. Ruby, Esq.
Bailey & Glasser, LLP
Charleston, West Virginia
Attorneys for Respondent

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS**

1. *"A de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

2. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

3. "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2)

i

whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. Pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

**HUTCHISON, Justice:**

A Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board has reported that the respondent Daniel R. Grindo, a member of the West Virginia State Bar, violated multiple provisions of the West Virginia Rules of Professional Conduct (sometimes "RPC" or "Rules") by overbilling the West Virginia Public Defender Services ("PDS") and by providing false information to presiding circuit courts, the PDS, and the Office of Lawyer Disciplinary Counsel ("ODC"). The HPS recommends that our Court adopt its findings of fact and conclusions of law and then impose a sanction to include a two-year suspension from the practice of law; additional continuing legal education; payment of the costs of the disciplinary proceeding; and a restriction on the respondent's future practice of law.

After a thorough review of the record developed before the HPS, and upon a consideration of the parties' briefs and oral argument, we conclude that the respondent has violated multiple Rules of Professional Conduct and adopt the HPS's recommended sanction.

## I. Facts and Procedural Background

The respondent has been a licensed member of the West Virginia State Bar since September 2002. On October 9, 2018, the Investigative Panel of the Lawyer Disciplinary Board issued a formal Statement of Charges against the respondent for misconduct surrounding vouchers the respondent submitted for payment of his time and expenses on court-appointed representations of indigent criminal defendants. The HPS

held an evidentiary hearing on February 25, 2019, where the following information was adduced.

Between 2013 and 2015, a large portion of the respondent's private practice of law was court-appointed criminal defense work. To be reimbursed for their time and expenses by the State of West Virginia, lawyers in private practice who perform court-appointed criminal defense work must comply with the provisions of West Virginia Code § 29-21-13a (2008).[1] This statute requires the attorney to "maintain detailed and *accurate* records of the time expended and expenses incurred on behalf of eligible clients[.]" *Id.* § 13a(a) (emphasis added). Claims for reimbursement in each case are made on vouchers that are first submitted to the appointing circuit court judge for approval, and are then forwarded to the PDS for review and payment. *Id.* In their vouchers, lawyers must "specifically set forth the nature of the service rendered[.]" *Id.* § 13a(g). Pursuant to this statute, attorneys are compensated by the PDS for "*actual* and necessary time expended for services performed and expenses incurred[.]" *Id.* § 13a(d) (emphasis added).

West Virginia Code § 29-21-13a also specifies rates of compensation. Pursuant to the 2008 version of the statute, an attorney's work performed outside of court was compensated at the rate of forty-five dollars per hour; an attorney's work performed

---

[1] Although West Virginia Code § 29-21-13a was amended in 2019, we rely upon the 2008 version that was in effect when the respondent committed his misconduct.

2

in court was compensated at sixty-five dollars per hour; and a paralegal's work performed outside of court was compensated at the paralegal's regular rate of hourly compensation not to exceed twenty dollars per hour. *Id.* § 13a(d).[2]

By early 2015, the PDS had acquired new computer software and sufficient electronic data to generate reports that tracked payments to individual lawyers for the time billed on any particular day, regardless of which case or cases the lawyer reported working on. These reports revealed that several lawyers, including the respondent, had submitted

---

[2] West Virginia Code § 29-21-13a(d)(1) and (2) (2008) provide as follows:

> (d) In each case in which a panel attorney provides legal representation under this article, and in each appeal after conviction in circuit court, the panel attorney shall be compensated at the following rates for actual and necessary time expended for services performed and expenses incurred subsequent to the effective date of this article:
> (1) For attorney's work performed out of court, compensation shall be at the rate of forty-five dollars per hour. For paralegal's work performed out of court for the attorney, compensation shall be at the rate of the paralegal's regular compensation on an hourly basis or, if salaried, at the hourly rate of compensation which would produce the paralegal's current salary, but in no event shall the compensation exceed twenty dollars per hour. Out-of-court work includes, but is not limited to, travel, interviews of clients or witnesses, preparation of pleadings and prehearing or pretrial research.
> (2) For attorney's work performed in court, compensation shall be at the rate of sixty-five dollars per hour. No compensation for paralegal's work performed in court shall be allowed. In-court work includes, but is not limited to, all time spent awaiting hearing or trial before a judge, magistrate, special master or other judicial officer.

vouchers containing information that was obviously wrong. The PDS discovered that between January 1, 2013 and early 2015, the respondent submitted vouchers claiming that he had worked on appointed criminal cases for more than thirty hours in a single day on five different dates; more than twenty-four hours a day on sixteen dates; more than twenty hours a day on forty-seven dates; and more than fifteen hours a day on ninety-six dates. In addition, the PDS determined that the respondent had submitted duplicate mileage claims constituting $1,927.86 in overpayments.

PDS Executive Director Dana Eddy, Esq., contacted the respondent about his vouchers. The respondent cooperated with Mr. Eddy, and on June 4, 2015 they entered into a "Conciliation Agreement" where the respondent admitted that he had billed work performed by his non-attorney staff at the attorney rate. The Conciliation Agreement provides, *inter alia*, as follows:

> **WHEREAS,** PDS's audit of the vouchers submitted by Grindo found that, since January 1, 2013, Grindo has exceeded thirty (30) hours of billing on five (5) dates; twenty-four (24) hours of billing on sixteen (16) dates; twenty (20) hours of billing on forty-seven (47) dates; and fifteen (15) hours of billing on ninety-six (96) dates;
>
> **WHEREAS**, PDS's audit did not include the time that was billed by Daniel K. Armstrong [another lawyer in the respondent's office] for these same dates;
>
> **WHEREAS**, Grindo willingly met with PDS to discuss the findings in the audit;
>
> **WHEREAS**, Grindo disclosed that the business model for the law firm consisted of the utilization of non-attorneys to deliver legal services to clients under the supervision and direction of

4

attorneys and that the time devoted by the non-attorneys to the performance of legal tasks was billed at the rates of compensation for "attorney work" under the Governing Act because, Grindo claims that, otherwise, his office loses money when using staff to perform such services at the rates permitted for paralegal services under the provisions of the Governing Act;

**WHEREAS**, Grindo's recordkeeping assures the recording and documenting of services contemporaneously with the performance of the services and accurately reflects the personnel who performed the tasks related to these services and the time expended in performing the tasks;

**WHEREAS**, Grindo explained that he consulted with other members of the bar when he commenced his legal practice and, accordingly, Grindo believed that his billing procedures were acceptable to PDS;

**WHEREAS**, Grindo asserts that PDS's guidelines are not compiled in a manner that readily permits compliance by panel attorneys;

**WHEREAS**, Grindo believes that the circuit court understood his business model and understood the method by which the compensation for handling an eligible client's case was calculated[.]

Thus, the respondent admitted that his "business model" was to report to circuit court judges and to the PDS that work by his nonlawyer staff was performed by himself, and then to bill for this work at the higher lawyer rate.[3] Although he asserted in the Conciliation Agreement that judges understood his billing practice, he presented no evidence during the HPS hearing to prove that any judge, let alone a judge who had approved one of the

---

[3] The record does not disclose the job titles or qualifications of the respondent's nonlawyer staff who worked on his court-appointed cases. The parties refer to these employees as paralegals, so we will accept that characterization.

5

vouchers at issue, was aware of this practice. The respondent signed the Conciliation Agreement in two places.

As part of the Conciliation Agreement, the respondent agreed to reimburse the PDS by accepting a one-third reduction of the total amount of fees claimed on all of his vouchers that were being held by the PDS at that time. The total amount of this reduction amounted to $40,425.90. Mr. Eddy explained that this was a negotiated settlement; he testified that "if we had grossed it up to account for all historical [improper] billing, it would've exceeded the amount of the vouchers that we were holding and I'm quite sure he [the respondent] didn't have the wherewithal to pay it." In addition, the respondent agreed to directly repay the PDS the $1,927.86 in duplicate mileage claims within one calendar month. Thereafter, the PDS adjusted its voucher payments to the respondent to account for the one-third reduction in fees. However, the respondent did not repay the $1,927.26 until May 2017, almost two years after it was due.

Mr. Eddy testified that although he believed the respondent and his employees had performed the work, it was his opinion that these billing practices nonetheless constituted a form of fraud as well as a violation of West Virginia Code § 29-21-13a. He also explained that overbilling of PDS by various attorneys had contributed to a negative opinion held by the Legislature and other State officials, which in turn impeded Mr. Eddy's ability to convince the Legislature to increase the hourly rates for all court-appointed attorneys.

6

The Conciliation Agreement also required the respondent to seek independent legal counsel on the question of whether his conduct should be reported to the ODC. The Conciliation Agreement provided that if within one month the respondent had not notified the PDS that he had either self-reported to the ODC or received advice that reporting was not required, then Mr. Eddy would determine whether to make such a report.[4] The respondent wrote Mr. Eddy on August 10, 2015, and said "I am self-reporting to ODC. This should be complete by the end of the week." Mr. Eddy testified that when he later spoke with the respondent, the respondent said that *he had already reported* this matter to the ODC. However, the HPS found no record that the respondent ever reported this matter to the ODC.[5] Mr. Eddy believes that the respondent lied about self-reporting in order to dissuade Mr. Eddy from filing an ethics complaint. When the ODC began investigating this matter, the respondent claimed that he did not recall ever telling Mr. Eddy that he had already self-reported. After hearing the evidence and weighing witness credibility, the HPS determined that the respondent's claim about this lack of recollection was false.

---

[4] RPC 8.3(a) (2015) requires that "[a] lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."

[5] The hearing transcript reflects that the ODC initiated this ethics complaint against the respondent upon receiving subpoenaed information from the PDS about lawyers who overbilled.

7

The respondent testified during the HPS's evidentiary hearing. However, he did not present any other witnesses and did not offer any exhibits.[6] He explained that he or his employees had performed all of the work reported on the vouchers, and that some of the work had been performed by another lawyer in his office but billed under the respondent's name. However, the respondent admitted that paralegal work had been billed to the PDS as out-of-court attorney time. The respondent acknowledged that he had used "an improper method to track staff time and such." He denied committing any intentional wrongdoing, and asserted that he had thought his accounting methodology was correct.

After considering the evidence and arguments, the HPS submitted its report to this Court on August 22, 2019. The HPS concluded that by submitting vouchers where he claimed he billed thirty hours on five dates, twenty-four hours on sixteen dates, twenty hours on forty-seven dates, and fifteen hours on ninety-six dates, the respondent violated the Rule of Professional Conduct requiring that a lawyer's fees shall be reasonable, RPC 1.5(a).[7]

---

[6] Because the respondent missed the deadline to disclose his witnesses and exhibits, the ODC moved to exclude presentation of the same. During a pre-trial hearing, the respondent indicated that he did not have any witnesses or exhibits to offer beyond what the ODC had already disclosed. Accordingly, the HPS granted the ODC's motion.

[7] The respondent's misconduct was committed prior to the January 1, 2015, amendments to the Rules of Professional Conduct. The version of the Rule applicable to this case, RPC 1.5(a) (1990), provides:

**Rule 1.5. Fees.**

The HPS also concluded that because the respondent should have known how to properly submit billing vouchers under the statute, but he nonetheless submitted inaccurate and improper vouchers representing time for paralegals as attorney time to the circuit court for approval, he violated the ethics rule requiring candor toward a tribunal, RPC 3.3(a)(1) (1989).[8]

Furthermore, the HPS concluded that the respondent engaged in a pattern and practice of submitting vouchers and claims for fees wherein he knowingly billed paralegal

_____

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

[8] RPC 3.3(a)(1) (1989) provides:

**Rule 3.3. Candor toward the tribunal.**
(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal[.]

9

services at an attorney rate, and he therefore failed to accurately comply with West Virginia Code § 29-21-13a. The HPS concluded that these actions were misconduct prejudicial to the administration of justice in violation of RPC 8.4(d) (1995).[9]

In addition, the HPS found that "in an effort to avoid inquiry into his over-billing to PDS that would subject him to disciplinary action, Respondent knowingly deceived and intentionally made false statements to PDS regarding" self-reporting his conduct to the ODC. The HPS also concluded that the respondent made an initial representation to the ODC regarding the self-report clause of the Conciliation Agreement that was misleading. For this conduct, the HPS concluded that the respondent violated RPC

---

[9] RPC 8.4(d) (1995) provides:

> **Rule 8.4. Misconduct**
> It is professional misconduct for a lawyer to:
> . . . (d) engage in conduct that is prejudicial to the administration of justice[.]

10

8.1(a),[10] which prohibits false statements to the ODC, and RPC 8.4(c), which prohibits dishonesty, fraud, deceit or misrepresentation.[11]

Finally, the HPS rejected one of the charges set forth in the Statement of Charges against the respondent. The Investigative Panel had alleged that "[b]ecause Respondent committed criminal acts of fraudulent schemes in violation of W.Va. Code § 61-3-24d [(1995)], Respondent violated Rule 8.4(b) of the Rules of Professional Conduct." West Virginia Code § 61-3-24d is a criminal statute, and Rule 8.4(b) prohibits a lawyer from committing criminal acts that reflect adversely on the lawyer's honesty,

---

[10] The HPS concluded that the respondent's violation of Rule 8.1(a) occurred both before and after the January 1, 2015, amendments to the RPC. However, both the 1989 and 2015 versions of Rule 8.1(a) are the same:

> **Rule 8.1. Bar admission and disciplinary matters.**
> An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
> (a) knowingly make a false statement of material fact[.]

[11] The HPS concluded that the respondent's violation of Rule 8.4(c) occurred both before and after the January 1, 2015, amendments to the RPC. However, both the 1995 and 2015 versions of Rule 8.4(c) are the same:

> **Rule 8.4. Misconduct.**
> It is professional misconduct for a lawyer to:
> . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]

trustworthiness or fitness. The HPS found no merit to this charge because the respondent had not been convicted of any crimes.[12]

After hearing the evidence, the HPS found that the respondent had acted intentionally and knowingly, but not deceitfully or fraudulently, when he wrongly submitted vouchers to the presiding courts and to the PDS that claimed paralegal time as lawyer time. However, the HPS found that the respondent's false statements to Mr. Eddy and to the ODC regarding self-reporting were intentional, knowing, fraudulent, deceitful, and for the purpose of misleading.

For his violations of the Rules, the HPS recommended that this Court suspend the respondent from the practice of law for two years; require him to comply with Rule of Lawyer Disciplinary Procedure ("RLDP") 3.28 specifying the duties of a lawyer who is suspended; require that prior to filing a petition for reinstatement, the respondent shall complete six additional hours of continuing legal education in the area of ethics; require that prior to filing a petition for reinstatement, the respondent shall pay the costs of

---

[12] Initially, the ODC notified the Court that it had no objection to the HPS Report. However, in its brief, the ODC now states that the HPS's decision regarding the application of Rule 8.4(b) was incorrect. The ODC does not cite any authority for this position, and makes only the vaguest of legal arguments about this. Under the specific facts of this case, we accept the HPS's recommendation to dismiss the charge accusing the respondent of violating Rule 8.4(b). *See Lawyer Disciplinary Bd. v. Kupec*, 202 W.Va. 556, 505 S.E.2d 619 (1998) (recognizing that only Supreme Court, and not Hearing Panel Subcommittee, has authority to dismiss formal lawyer disciplinary charge).

this disciplinary proceeding; and order that if the respondent should be reinstated to the practice of law, he be prohibited from engaging in work compensated through PDS. The ODC filed a notice with our Court indicating that it had no objection to the HPS's report. However, the respondent objected and this matter was set for oral argument.

## II. Standard of Review

The standards we use to decide a lawyer disciplinary matter are well settled:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). While we respectfully consider the HPS's recommendations on the appropriate sanction to impose, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). Finally, we are mindful that RLDP 3.7 requires the ODC to prove the allegations in a Statement of Charges by clear and convincing evidence. Syl. Pt. 1, *Lawyer*

*Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). With these considerations in mind, we address this lawyer disciplinary matter.

### III. Discussion

It is not entirely clear from the respondent's brief[13] whether he challenges only the sanction recommended by the HPS, or both the sanction and the HPS's conclusions of law regarding the violations of specific Rules of Professional Conduct. Accordingly, we will address both.

### A. Rule Violations

As explained herein, upon reviewing the record and considering the parties' arguments, we agree with the HPS's conclusion that the respondent has violated multiple Rules. The respondent's misconduct can be categorized into two general areas that we will separately discuss: the submission of false billing vouchers to circuit courts and the PDS, and the making of false representations of fact to Mr. Eddy and the ODC about self-reporting his misconduct.

Several of the respondent's billing vouchers are obviously false, if not impossible. There were many dates when he billed the PDS for twenty or twenty-four hours

---

[13] The respondent filed his brief with this Court *pro se*, but obtained counsel for the oral argument.

in a single day, and on five dates he billed for more than twenty-four hours in a single day. The volume of days with extreme billable hours belies any notion that these charges were mere errors. There is undisputed evidence to establish that when the respondent's non-attorney employees performed work, the respondent would bill the PDS for this work by representing that *he* had performed the work and by charging the *attorney* hourly rate of pay. The respondent's billing practices were in direct violation of West Virginia Code § 29-21-13a(d), which specifies different reimbursement rates for attorney time and for paralegal time. They were also violative of the requirement in § 29-21-13a(a) that attorneys maintain "accurate" records of time and expenses, and of the provision in § 29-21-13a(d) allowing an attorney to be compensated by the PDS for "actual" time and expenses.

Unfortunately, these were not isolated instances of inaccurate billing. In his Conciliation Agreement with the PDS, the respondent acknowledged that this was his "business model" in order to make enough money on court-appointed cases.[14] In the Conciliation Agreement, he admitted that he billed paralegal time at the higher attorney rate because otherwise, "his office loses money when using staff to perform such services

---

[14] In this disciplinary case, the respondent asserts that the term "business model" was used by his staff member, and not by himself, during their initial meeting with Mr. Eddy. However, the Conciliation Agreement expressly provides that "Grindo disclosed that the business model for the law firm consisted of" billing for non-attorney work "at the rates of compensation for 'attorney work' . . . because, Grindo claims that, otherwise, his office loses money[.]" The respondent signed the Conciliation Agreement in two places. Thus, while he may not have personally spoken the words "business model," he has assented to this characterization.

15

at the rates permitted for paralegal services under the provisions of the Governing Act." Because the out-of-court attorney rate of forty-five dollars per hour was more than double the maximum paralegal rate of twenty dollars per hour, the respondent received a significant financial benefit from this illegal practice. The respondent agreed to reimburse the PDS a substantial amount, forty thousand dollars, for overbilling his paralegals' time over a two-year period. This amount was reached pursuant to a negotiated settlement, and Mr. Eddy indicated that the actual amount of false billing was certainly higher.

This overbilling constituted misrepresentations of fact to both the circuit court judges who reviewed and approved the vouchers, and to the PDS who paid the vouchers with taxpayer money. Because the respondent billed his daily time across different cases, the overbilling would not have been evident to a circuit court judge when reviewing a voucher for a single case. The overbilling was not discovered by the PDS until it acquired new software.

In his brief to this Court, the respondent argues that his actions do not constitute willful violations of the Rules. He contends that he and his staff performed the work on the appointed criminal cases, but as the result of "an unfortunate mistake," his office used incorrect billing procedures. We reject this argument and the characterization of his practices as simply a "mistake." The respondent, an experienced attorney, was

obligated to follow the statutory law regarding billing the PDS, and West Virginia Code § 29-21-13a(d) very clearly establishes different rates for attorney time and paralegal time.[15] Moreover, we find it incredible that an attorney would think that billing for staff work at an attorney's higher hourly rate would be an acceptable practice.

The fact that work may have been performed on the clients' cases, albeit by nonlawyers, does not excuse the respondent's unethical billing practices. In *Lawyer Disciplinary Board v. Cooke*, 239 W.Va. 40, 799 S.E.2d 117 (2017), we considered a lawyer disciplinary case where a lawyer overbilled the PDS by engaging in "value billing." In other words, the lawyer performed the work but instead of billing for the actual time spent, he reported a larger amount of time on his PDS vouchers in order to be compensated more closely to what he considered the value of each task. *See id.* at 45, 799 S.E.2d at 122. In concluding that Mr. Cooke violated the Rules, our Court "emphatically" rejected the excuse that the work had actually been performed. *See id.* at 52 n.39, 799 S.E.2d at 129 n.39. We emphasized that the statute only authorizes compensation for "actual and necessary time expended for services performed and expenses incurred[.]" *Id.* (quoting W.Va. Code § 29-21-13a(a)).

In the case before us, the "actual" work performed was work by paralegals, not by lawyers. Indeed, there is no effective difference between the "value billing" in *Cooke*

---

[15] *See supra* n. 2.

17

and the respondent's "business model" of billing his paralegals' time at a higher rate. In both scenarios, the work may have been performed, but the taxpayers are being charged substantially more than the law allows. The respondent even admitted in the Conciliation Agreement that this "business model" was for financial gain; otherwise, his firm would lose money.

As such, we agree with the HPS that the respondent's billing practices violated Rules 1.5(a), 3.3(a)(1), and 8.4(d) of the Rules. The respondent violated Rule 1.5(a)[16] because it is unreasonable to charge an hourly rate for more hours than a person has actually worked, and it is unreasonable to charge a fee contrary to state law. The respondent displayed a lack of candor toward the tribunal in violation of Rule 3.3(a)(1)[17] by submitting inaccurate vouchers to circuit courts for approval. His pattern and practice of knowingly billing paralegal services at an attorney rate, in clear violation of state law, was prejudicial to the administration of justice in violation of Rule 8.4(d).[18]

As to the remaining charges, the respondent promised Mr. Eddy that he would self-report his misconduct to the ODC. Subsequently, he falsely told Mr. Eddy that he *had already* reported himself to the ODC. These actions were obviously made for the

---

[16] *See supra* n. 7.

[17] *See supra* n. 8.

[18] *See supra* n. 9.

18

purpose of deceiving Mr. Eddy so that Mr. Eddy would not file an ethics complaint.[19] In addition, when the ODC became aware of this matter and contacted the respondent, his initial response mischaracterized what had occurred. Instead of acknowledging that he had lied to Mr. Eddy, the respondent falsely told the ODC that he simply "didn't recall" saying that he had self-reported. The evidence supports the HPS's finding that the respondent's misrepresentations were intentional, knowing, fraudulent, deceitful, and for the purpose of misleading.

Accordingly, we agree with the HPS's conclusion that the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c)[20], and that he knowingly provided false information in connection with a disciplinary matter in violation of Rule 8.1(a).[21]

## B. Sanction

Having concluded that the respondent violated multiple Rules of Professional Conduct for his improper and dishonest billing and for his misrepresentations, we turn to the question of what sanction should be imposed. As set forth above, the HPS recommends

---

[19] As a licensed attorney himself, Mr. Eddy is subject to RPC 8.3(a) regarding reporting unethical conduct. *See supra*, n. 4.

[20] *See supra* n. 11.

[21] *See supra* n. 10.

a two-year suspension from the practice of law, along with other penalties. The ODC supports this recommendation. The respondent asks our Court to impose a less-severe sanction that does not include a suspension from the practice of law. He does not specifically challenge other aspects of the recommended sanction, such as the provision that would prohibit him from engaging in future work compensated by the PDS.

Our goal in imposing lawyer discipline is not simply the punishment of the offending lawyer; a sanction must also be designed to deter the conduct of other lawyers and to restore the public's confidence in our system.

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. Pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987). The determination of an appropriate sanction is guided by syllabus point four of *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998):

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the

20

actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

With regard to the first *Jordan* factor, the HPS found that the respondent violated his duties to his clients, the public, the legal system, and the legal profession. The HPS correctly observed that members of the public are entitled to expect that lawyers will exhibit the highest standards of honesty and integrity and will not engage in illegal or improper conduct. Moreover, public money was used to pay for the respondent's overbilling. "This Court considers the protection of the public and the State coffers of paramount importance, particularly as pertains to lawyer disciplinary matters." *Cooke*, 239 W.Va. at 55, 799 S.E.2d at 132. As to the second *Jordan* factor, the HPS found "no question" that the respondent had acted intentionally and knowingly as it relates to the submission of the improper vouchers to circuit courts and the PDS. The HPS concluded that the respondent "acted with the intent to submit non-attorney staff time at a rate nearly triple the compensable amount for his own financial gain." With regard to the false representations about reporting his conduct to the ODC, the HPS found that these actions were intentionally made for the purpose of misleading Mr. Eddy and the ODC. When addressing the third *Jordan* factor, the HPS found that there is potential injury to the respondent's former criminal clients because it is possible they could be ordered to reimburse the State for amounts that were over-billed. Moreover, the HPS found that overbilling by the respondent and other lawyers has caused real injury to the legal system by contributing to the bad reputation of court-appointed attorneys. We agree with the HPS's application of the first three *Jordan* factors.

21

The fourth *Jordan* factor takes into account any aggravating or mitigating evidence relevant to the issue of what sanction should be imposed. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. Pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003). In contrast, "[m]itigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." *Id.* at 209, 579 S.E.2d at 550, syl. pt. 2. Mitigating factors may include any of the following:

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

*Id.* at 210, 579 S.E.2d 551, syl. pt. 3.

The HPS found the presence of several aggravating factors in this case, and we agree. Most notably, the respondent has been the recipient of prior lawyer discipline. In June 2013, this Court publically reprimanded him for his conduct in two separate cases where he failed to act diligently, failed to expedite his clients' cases, and failed to comply with court orders requiring him to file briefs. *See Lawyer Disciplinary Bd. v. Grindo*, 231

22

W.Va. 365, 745 S.E.2d 256 (2013). The Court recognized the presence of case law that would support imposing a thirty-day suspension, but the sanction was reduced to a public reprimand because of the presence of mitigating factors. These factors included that the respondent's time had been occupied with a seriously ill family member, he had already hired additional employees to work in the firm, and he had hired a law office management expert to improve firm practices. *Id.* at 371, 745 S.E.3d at 262.[22]

Additionally, on December 16, 2009, the Investigative Panel admonished the respondent regarding his conduct in four separate cases. An Investigative Panel admonishment is "aggravating just like any other disciplinary action." *Lawyer Disciplinary Bd. v. Sturm*, 237 W.Va. 115, 128, 785 S.E.2d 821, 834 (2016). In a complaint filed by Linda M. Steen, the Investigative Panel admonished the respondent for charging an unreasonable non-refundable retainer, failing to promptly return the unearned fee, and failing to respond to the ODC. *See Investigative Panel Closing Order*, No. 08-03-018 (Dec. 16, 2009). In a complaint filed by Charles E. Ball, the Investigative Panel warned the respondent of his duty to appear at all duly noticed hearings, and admonished the respondent for failing to respond to the ODC. *See Investigative Panel Closing Order*, No. 08-01-070 (Dec. 16, 2009). With regard to the complaint filed by Robin L. Goodrich, the respondent was admonished for failing to keep his client reasonably informed, delaying the client's case, and failing to respond to the ODC. *See Investigative Panel Closing Order*,

---

[22] Those mitigating factors are not present in the current case.

23

No. 08-04-234 (Dec. 16, 2009). Finally, in the complaint of Jesse A. Lynch, the respondent was admonished for failing to respond to the ODC. *See Investigative Panel Closing Order*, No. 08-04-413 (Dec. 16, 2009).

Other aggravating factors include that the respondent was experienced in the practice of law when he committed these violations, and there were multiple offenses constituting a pattern of misconduct. The respondent had a duty to understand and follow the billing statute, which he failed to do. Moreover, the respondent benefitted financially from his actions, although he did rectify this, at least in part, by eventually complying with the Conciliation Agreement. Finally, his statements to Mr. Eddy and the ODC regarding self-reporting were found to be deceitful.

Although the HPS found the presence of some mitigating factors in this case, we do not agree. The HPS credited the respondent for cooperating with Mr. Eddy and entering into the Conciliation Agreement. However, as we observed in another case involving the submission of false PDS vouchers, entering into a conciliation agreement with the PDS under these circumstances "amounts to compelled restitution." *Lawyer Disciplinary Bd. v. Hassan*, 241 W.Va. 298, 305, 824 S.E.2d 224, 231 (2019) (refusing to credit as mitigation a lawyer's entry into, and compliance with, PDS conciliation agreement). We also reject the HPS's consideration of remorse as a mitigating factor in this case. While claiming remorse, the respondent continues to argue that his illegal billing practice amounted to nothing more than an "unfortunate mistake." Finally, we reject the

24

HPS's recommendation that the respondent should receive any benefit from the fact that the billed work was actually completed by his staff. Although the work may have been completed by his paralegal(s), that does not justify his charging the considerably higher attorney hourly rate in direct violation of state law.

While no two lawyer disciplinary matters ever present the exact same circumstances, we nonetheless endeavor to impose similar discipline for similar misconduct. Unfortunately, this Court has had the opportunity to consider other PDS overbilling cases in recent years. As discussed above, in *Cooke* an attorney was "value billing" his work to the PDS. *Cooke*, 239 W.Va. 40, 799 S.E.2d 117. Like the respondent, Mr. Cooke had many days where he billed an obviously false number of hours to the PDS, including five days with over twenty hours of billable time and two days that were over twenty-four hours of billable time. *Id.* at 50, 799 S.E.2d at 127. Mr. Cooke also had instances of billing for the same travel in multiple cases. *Id.* Also similar to the respondent, Mr. Cooke's billing practices were intentional and conducted for the purpose of financial gain. *Id.* Furthermore, Mr. Cooke committed unethical acts in two others other matters. In an abuse and neglect case, he ignored a court order to file his *guardian ad litem* brief. *Id.* at 43, 799 S.E.2d at 120. In a property case, he failed to communicate with his client, failed to properly terminate the representation, failed to hold client money in a client trust account, and failed to promptly refund the client's retainer. *Id.* at 47, 799 S.E.2d at 124. For his unethical conduct, Mr. Cooke was suspended from the practice of law for two years, among other sanctions. *Id.* at 55-56, 799 S.E.2d at 132-33. Critically, we explained in

25

*Cooke* that "with respect to fraudulent billing, suspensions of *years*, rather than months are the presumptive sanction. This Court considers the protection of the public and the State coffers of paramount importance, particularly as pertains to lawyer disciplinary matters." *Id.* at 55, 799 S.E.2d at 132. As additional sanctions, Mr. Cooke was required to complete extra continuing legal education; was required to pay the costs of the disciplinary proceeding; and if he is reinstated, he must practice under the supervision of another attorney for one year. *Id.* at 55-56, 799 S.E.2d at 132-33.

In *Hassan*, a lawyer was suspended from the practice of law for six months for overbilling the PDS on multiple dates—including several days where the number of hours billed were in excess of twenty-four hours. 241 W.Va. at 301, 824 S.E.2d at 227. As in the instant case, Mr. Hassan admitted using improper billing practices because, otherwise, he would lose money on appointed cases. *Id.* at 305 n.22, 824 S.E.2d at 231 n.22. Nonetheless, there are critical distinctions between the *Hassan* case and that of the respondent. Mr. Hassan self-reported his conduct to the ODC, did not lie to anyone about self-reporting, and stipulated to his violations of the Rules of Professional Conduct. Moreover, Mr. Hassan had not received any prior lawyer discipline and did not have any instances of double-billing his travel expenses. *Id.* at 305-06, 824 S.E.2d at 231-32.

In yet another case, we suspended a lawyer for two years for overbilling the PDS. *See Lawyer Disciplinary Bd. v. Jacovetty*, No. 18-0365 (W.Va. Apr. 11, 2019) (unpublished order). Mr. Jacovetty entered into a conciliation agreement to repay the PDS

26

$127,772. He also failed to self-report his conduct, had a prior Investigative Panel admonishment, and had substantial experience in the practice of law.

During oral argument, the respondent's counsel urged this Court to impose the same sanction as was imposed in *Lawyer Disciplinary Board v. Ahlborn*, Nos. 18-0334 and 18-0589 (W.Va. Jan. 30, 2020) (unpublished order). The sanction in that case was a six-month suspension, with all six months deferred while the lawyer serves two years of probation with the State Bar; two years of supervised practice; compliance with a five-year monitoring agreement with the West Virginia Judicial Lawyer Assistance Program ("WVJLAP"); and costs. However, the circumstances underlying *Ahlborn* are drastically different from the respondent's case.[23] In *Ahlborn*, the lawyer exhibited a lack of diligence and a failure to communicate with clients, and she submitted PDS vouchers that contained some days with an excessive number of billable hours. The HPS found that the lawyer had fallen behind in completing her PDS vouchers and when re-constructing the time for work that she had performed, she mistakenly double-billed some work or ascribed some work to the wrong dates. Although the vouchers were improper and the lawyer had violated the RPC, the HPS characterized the actions as "mistakes" and "unintentional errors" resulting from being "disorganized, careless and negligent in maintaining time and billing

---

[23] Because the respondent urges this Court to consider our unpublished *Ahlborn* order as precedent, we refer to the "Finding of Fact, Conclusions of Law and Recommended Sanctions of the Hearing Panel Subcommittee" that formed the basis for the sanction in that case.

records[.]" Moreover, after considering the evidence and the stipulations of the parties, the HPS determined that the lawyer was suffering from a medical condition that could be remedied through participation with WVJLAP. By contrast, the respondent had a business model of billing paralegal work at illegal rates, he lied about self-reporting, and there are no factors to mitigate his sanction.

In our final analysis, we are persuaded to impose a significant period of suspension in this case not only because the respondent overbilled the PDS, but also because he lied to Mr. Eddy and the ODC in an effort to avoid facing the consequences of his actions. "[N]o single transgression reflects more negatively on the legal profession than a lie." *Lawyer Disciplinary Bd. v. Munoz*, 240 W.Va. 42, 51, 807 S.E.2d 290, 299 (2017) (quoting *Astles' Case*, 594 A.2d 167 (N.H. 1991)). "Respect for our profession is diminished with every deceitful act of a lawyer." *Munoz* at 51, 807 S.E.2d at 299 (quoting *Disciplinary Counsel v. Fowerbaugh*, 658 N.E.2d 237, 239 (Ohio 1995)). Because of this dishonesty, we conclude that this case is more akin to *Cooke* than it is to *Hassan* or *Ahlborn*.

Upon consideration of all of the above, we determine that a two-year suspension from the practice of law, along with the other recommendations, is appropriate. Accordingly, we adopt the HPS's recommended sanction.

## IV. Conclusion

For the foregoing reasons, we order the following:

(1) The respondent is suspended from the practice of law for a period of two years.[24]

(2) The respondent shall comply with the provisions of Rule of Lawyer Disciplinary Procedure 3.28 regarding the duties of a suspended lawyer.

(3) Prior to filing a petition for reinstatement, the respondent shall complete six additional hours of continuing legal education in the area of ethics.

(4) Prior to filing a petition for reinstatement, the respondent shall pay the costs of this disciplinary proceeding.

(5) If the respondent should be reinstated to the practice of law, he shall be prohibited from engaging in work compensated through West Virginia Public Defender Services.

Two-year suspension and other sanctions ordered

---

[24] Because of the length of the suspension, the respondent must petition for reinstatement to the practice of law in accordance with RLDP 3.32.

29